J-A04028-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| XTO ENERGY, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| DOMINION FIELD SERVICES, INC., EQUITRANS, LP, EQT ENERGY, LLC, AND EQT CORPORATION | |
| v. | |
| LINN ENERGY, LLC, F/K/A, LINN ENERGY HOLDINGS, LLC AND LINN OPERATION, INC. | |
| APPEAL OF: DOMINION FIELD SERVICES, INC. | No. 837 WDA 2013 |

Appeal from the Judgment Entered on April 18, 2013,
In the Court of Common Pleas of Allegheny County
Civil Division at No.: GD-10-004393

| | |
|---|---|
| XTO ENERGY, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPELLANT | |
| v. | |
| DOMINION FIELD SERVICES, INC., EQUITRANS, LP, EQT ENERGY, LLC AND EQT CORPORATION | |
| v. | |
| LINN ENERGY, LLC F/K/A LINN ENERGY HOLDINGS, LLC, AND LINN OPERATION, INC. | No. 885 WDA 2013 |

Appeal from the Judgment Entered on April 18, 2013,
In the Court of Common Pleas of Allegheny County
Civil Division at No.: GD-10-004393

XTO ENERGY, INC.

v.

DOMINION FIELD SERVICES, INC.,
EQUITRANS, LP, EQT ENERGY, LLC, AND
EQT CORPORATION

v.

LINN ENERGY, LLC, F/K/A, LINN ENERGY
HOLDINGS, LLC AND LINN OPERATION,
INC.

APPEAL OF: EQUITRANS, LP, EQT
ENERGY, LLC, AND EQT CORPORATION

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 890 WDA 2013

Appeal from the Judgment Entered on April 18, 2013,
In the Court of Common Pleas of Allegheny County
Civil Division at No.: GD 10-004393

BEFORE:  BOWES, J., WECHT, J., and STABILE, J.

MEMORANDUM BY WECHT, J.:                    **FILED OCTOBER 22, 2014**

This matter comes before this Court on the parties' respective appeals

of various summary judgment rulings entered by the trial court.[1]  Those

_____

[1]  The parties address the appeal and cross-appeals to various orders.
However, under these circumstances, the respective appeals lie only from
the trial court's April 18, 2013 entry of final judgment in this matter.
***See generally Johnston the Florist, Inc. v. TEDCO Constr. Corp.***,
*(Footnote Continued Next Page)*

orders conclusively resolved a number of claims and cross-claims arising from a dispute involving the sale of natural gas that was occasioned by an error made by an employee of an intermediary to the transaction. We affirm the trial court's final judgment.

The factual history underlying this case is complicated, and involves esoteric aspects of how natural gas is traded. The trial court provided the following apt summary of the commercial context in which this dispute arose, as well as a summary of the events and relationships that led to the claims *sub judice*, the content of which is not substantially disputed by the parties.

> XTO Energy, Inc. ["XTO"] has filed a complaint raising a single count (breach of contract) against Dominion Field Services, Inc. ["DFS"]. . . .[1]
>
> [1] I am bifurcating the remaining claims raised in this litigation.
>
> The breach of contract claim arises out of writings between XTO and DFS for the sale of natural gas for the seven-month period between April 1, 2008 and October 31, 2008.[2]
>
> [2] The writings governing the period through June 30, 2008 were executed by [the Linn Energy parties]. On July 1, 2008, XTO succeeded to [the interest of the Linn Energy

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

657 A.2d 511, 514 (Pa. Super. 1995) ("Because the entry of judgment was considered to be a prerequisite to the exercise of this Court's jurisdiction, it was long this Court's policy to quash an appeal from an order upon which judgment had not been entered."). Nonetheless, all appeals filed in this matter were timely relative to the April 18, 2013 entry of judgment and the rules governing the timing of cross-appeals. **See** Pa.R.A.P. 511, 903(b). Consequently, our jurisdiction over the instant appeals is not in question.

parties ("Linn")[2]] in these contracts. Additional writings executed by XTO govern the period from August 1, 2008 through October 31, 2008.

A gas contract between XTO and DFS is comprised of two documents. The first is titled "Master Gas Contract General Terms and Conditions[" ("the Contract");] it sets forth common terms that govern all purchase transactions. The second document, known as a "Natural Gas Purchase Confirmation," is specific to each particular purchase; each Confirmation specifies the time period, quantity, price, meters, receiving pipeline, and any special conditions.

The contracts between XTO and DFS for the sale of gas provide for delivery through the use of a gathering system operated by Equitrans[, LP]. At DFS's request, Equitrans designates specific meters ["the Meters"] that may be used only for XTO's deliveries to DFS. The gas passing through [the Meters] goes into a gathering system that gathers gas on behalf of numerous buyers, with each meter serving only a single buyer.

Each meter measures the amount of gas leaving the meter and going into the gathering system. Equitrans is to credit DFS with the amount of gas shown on [the Meters]. At the end of each month, Equitrans is to furnish DFS a Production Statement showing, for the entire month, the amount of gas credited to DFS from each meter. DFS calculates payments owed to XTO based on the monthly totals shown on the Production Statement.

There are instances in which Equitrans, based on information furnished by parties using the Equitrans gathering system, will switch the credits from one party to another. This would occur, for example, if there was a writing signed by DFS, XTO, and EQT Energy, LLC and delivered to Equitrans, stating that all gas coming into [the Meters] should be credited to EQT Energy, rather than to DFS. In this case, there is no such writing.

---

[2] Linn is a cross-defendant to this action as the predecessor in interest to the contracts at issue, which later were acquired in full by XTO, retroactively to a date preceding the events underlying the instant litigation. For simplicity's sake, we have replaced the trial court's usage of "Linn/XTO" with "XTO," except where it is necessary to distinguish between those parties.

In April 2008, gas furnished by XTO began to flow through [the Meters] and into Equitrans' [p]ipeline. Equitrans gave credit to DFS for the gas [that] XTO delivered to the [M]eters in April, May, and June. DFS, in turn, paid XTO approximately $1.5 million for this gas.

In accordance with the parties' agreement, payments are made on an approximate two-month lag. Payment for the April sales is made in late June, payment for the May sales is made in late July, and the payment for the June sales is made in late August.[3]

[3] Linn made the April, May, and June deliveries. From July through October 2008, XTO delivered the gas to the [M]eters.

This litigation would not have occurred but for (1) mistakes made by Leslie Crider—an Equitrans employee—and (2) a sharp decline in the price of gas.

In late August 2008, Ms. Crider was looking at DFS's pool on Equitrans' invoices for April, May, and June. Ms. Crider remembered that some time ago there had been conversations between Steve Rafferty, Senior Vice President of EQT . . . and Curt Tipton, then a Vice President of Linn, involving Linn's sale to EQT Energy of the gas [that] XTO delivered in April, May, and June.[4] She testified that she thought EQT Energy had the deal so the gas should be in EQT Energy's pool rather than DFS's [pool]. Consequently, she transferred the gas, meaning that Equitrans cancelled DFS's credits of approximately $1.5 million [worth of gas] for April, May, and June and gave the credits to EQT Energy. Ms. Crider did so without first notifying EQT Energy or DFS.

[4] There were negotiations between Mr. Rafferty (EQT Energy) and Mr. Tipton beginning in March 2008 and ending in the middle of April 2008.

Immediately after she made the transfer, she advised Bernie Miele, her contact person at DFS, that she had switched the credits from DFS to EQT Energy. Ms. Miele responded through emails stating that the gas belonged to DFS and that DFS had already paid XTO for April, May, and June.

Ms. Crider also notified Steve Rafferty at EQT Energy of the transfer. On September 2, 2008, he told Ms. Crider that EQT

Energy had no claim for the gas—there had been negotiations but they never had a deal.[5]

> [5] He also testified that one of his conditions for a deal was his receiving a release from DFS.

Ms. Crider subsequently removed from EQT Energy the April, May, and June credits she had given to EQT Energy. However, she mistakenly failed to give these credits back to DFS.

Also, because Equitrans did not re-designate, as DFS meters, [the Meters], no one received any credit for XTO's July through October deliveries to [the Meters]. In addition, DFS reversed the $1.5 million payments made to XTO for the April-June deliveries. Thus, XTO has never received any payments for the gas delivered between April and October 2008.[6]

> [6] It is the position of Equitrans that this gas, which on paper remains in the gathering system, belongs to DFS and that XTO is entitled to payment based on the contract price.

Four days after Equitrans removed the credits from DFS and placed them with EQT Energy, DFS made the decision to walk away from its contracts with XTO for the period from April 1 through October 31, 2008. The decision was made by Joseph Vanzant, DFS's Vice President.

He testified that several events caused him to take this position:

Event 1—He learned from Bernie Miele that Ms. Crider told Ms. Miele that Equitrans was going to take the gas from DFS retroactive to April 1 because it belonged to someone else.[7]

> [7] Mr. Vanzant also knew or should have known that on the same date that Ms. Crider told Ms. Miele that she had transferred the credits to EQT Energy, through e-mails, Ms. Miele told Ms. Crider that this was DFS's gas and that DFS had paid for the gas. In the first e-mail, Ms. Miele states that DFS does have [the Meters] under contract with XTO. She further states that the contract was renewed in April 2008 and again in July with new ownership [*i.e.*, upon XTO's succession to the wells as part of its transaction with Linn].

Event 2—Mr. Vanzant had a DFS buyer, Neil Stultz, call Curt Tipton (now a former Linn employee who had never been

employed by XTO) to find out if there had been the sale of this gas from the DFS meters to another party. Mr. Vanzant testified that Mr. Stultz advised him that Mr. Tipton said to Mr. Stultz that he had sold the gas to EQT Energy (Steve Rafferty) back in April and forgot to take the gas off DFS's contract.

Event 3—Mr. Vanzant checked with his chief accountant and determined that because of falling gas prices, DFS would save several hundred thousand dollars if it walked away from the agreements with XTO. See the following e-mail from Mr. Vanzant to DFS's chief accountant explaining that DFS would net approximately $450,000 if it did not purchase the gas pursuant to the agreements with XTO because of the decline in the price of gas:

> Equitrans confirmed this morning something they told us last week. They have been crediting gas to DFS from 4 XTO meters that XTO sold to EQT Energy starting in April (XTO never told us they were going to sell this gas to EQT Energy and we included the 4 meters in our renewal of the XTO contract starting April 1). Equitrans is going to deduct this double-counted gas from DFS's pool, creating a big negative imbalance that DFS will have to fix [by obtaining and depositing in the pool an amount of gas equal to the negative imbalance].

> Happily, the nearly 138,000 [dekatherms] being taken away for the months April, May and June was priced at an average of $11.22/dth. We will start bringing in TCO gas[3] immediately to replace the gas being taken away. Assuming we buy the TCO gas at today's spot prices, plus TCO transport shrink, the replacement cost delivered to [the] TCO/Equitrans interconnect will be in the neighborhood of $7.90/dth. I figure this adjustment from Equitrans will net us somewhere near $450,000 in reduced gas cost. Yay!

---

[3]  In our review of the record, we cannot discern to what "TCO gas" specifically refers, but we assume that this relates to another source of natural gas sufficient to make up the deficit that would be created were DFS not to claim XTO's production.

Later that day, Mr. Vanzant explained in a subsequent e-mail to DFS's chief accountant that the economic benefit would be even greater than $450,000 because DFS would be able to replace the gas it was expecting from XTO in the future at lower prices.

Mr. Vanzant testified at pages 222-224 of his deposition that as of September 2 or September 3, he chose to walk away from the contract:

A. . . . . When I agreed to walk away, based on the financial analysis that I did, it's my opinion that at that point the meters were deleted retroactive to April 1.

Q. Okay. So I think you've answered my question. Your answer is as of September 2nd or 3rd of '08, you had a valid existing and enforceable contract for the meters with XTO, and it was your choice to either enforce those rights or acquiesce and walk away from the contract as of that date; correct?

A. Yes.

Q. And you chose to walk away?

A. Yes.

Q. And you chose to walk away retroactively back to April 1, 2008?

A. In my opinion, there were only two options: walk away effective April 1 or enforce it going forward.

Q. And if you walked away from the contract as of I'll just use September 2nd, 2008, you wouldn't have any claim to that gas from that day going forward; correct?

A. I wouldn't have any claim on that gas retroactive to April 1.

Q. Okay. Which would include the period following September 2nd, 2008, obviously?

A. Yes.

Mr. Vanzant also testified that he never informed XTO in writing that he had chosen to walk away from the contract until he sent XTO the meter deletion in the first week of November, that he

never spoke to EQT Energy, and that he never explained DFS's position to Equitrans:

> Q. Did you inform XTO in writing that that's what you had chosen to do?
>
> A. Not until we sent them the meter delete amendment in the first week of November.
>
> Q. And when you sent them the meter deletion amendment, did you—aside from sending them that form that you were agreeing to delete those meters as of whatever that day was, 11/1/2008, did you explain that you had made a decision to not enforce your rights, to walk away from the contract on September 2nd or September 3rd?
>
> A. I did not explain our position to XTO.
>
> Q. Did you explain that position to EQT Energy?
>
> A. I have never spoken to EQT Energy.
>
> Q. And did you explain that position to Equitrans?
>
> A. No.
>
> Q. Did anyone at DFS explain that position to Equitrans?
>
> A. No one asked our opinion. So I guess the answer is no.

Trial Court Opinion ("T.C.O."), 6/12/2012, at 1-7 (nomenclature modified for consistency).

In explaining its rejection of DFS's equitable estoppel defense to XTO's breach of contract claim, the trial court highlighted additional aspects of DFS's conduct in the wake of its discovery of Ms. Crider's error:

> DFS contends that the doctrine of equitable estoppel allows DFS to walk away from the contract. This doctrine might possibly apply if XTO engaged in conduct [that] caused DFS to believe that the gas was under contract with EQT Energy on the date [that DFS] decided to walk away from the contract.

Obviously, nothing that occurred before August 28, 2008 would have caused DFS to believe that the gas was under contract with EQT Energy because prior to this date DFS knew nothing about any negotiations between Linn and EQT Energy.

DFS contends that it was misled because of the failure of XTO to inform DFS that the gas belonged to DFS. Because of XTO's failure to demand that DFS pay for the gas, DFS believed that XTO recognized EQT Energy as the owner of the gas.

This argument is inconsistent with DFS's decision made on September 2, 2008 to walk away from what Mr. Vanzant believed to be a "valid existing and enforceable contract" . . . . This argument is also inconsistent with the information in Bernie Miele's e-mail that the gas belonged to DFS and that DFS had already paid XTO for the gas.

* * * *

DFS appeared to be doing its best to keep the matter muddled. An October 15, 2008 e-mail from a DFS employee to other DFS employees states: "I have received several telephone calls from various XTO personnel requesting contact names for EQT Energy personnel to pursue payment for the volumes taken away from DFS supposedly under contract with EQT Energy. The last telephone caller stated XTO was not impressed with EQT Energy and would be contacting Stultz to 'return' these meters to a DFS purchase contract."

Subsequently, in an October 20, 2008 e-mail, the same employee asked a supervisor to deal with Bob Wimpee (XTO Vice President) because she [knew] that DFS [did] not want the gas and fear[ed] she might misspeak:

The saga continues. . .

Bob Wimpee called this afternoon with a simple question on one of the renewals we just sent him. I answered him, and he began to ask about this issue. I explained to him that I had very limited knowledge on the subject.

I told him that the meters are on our contract. EQT Energy told him that these meters were not under contract to us, and he is questioning them further. In the meantime, I went and got the scoop from Bernie.

- 10 -

> I called to pass along to him that XTO put a deal in place with EQT Energy and that we should not have received the gas[,] which is why Equitrans made an adjustment to our pool and why we took payment back from XTO. He found out [that the Meters] were shut in and Curt Tipton worked out a deal to sell the gas to Steve Rafferty. The beauty of that is that neither XTO nor Equitrans can find the paperwork. Bob was going to call Leslie Crider to see, in light of the no contract information, what she had to authorize talking [*sic*] the gas from us.
>
> In talking with Bernie, I understand that it was actually a good thing for DFS to lose the gas, and that we do not want the gas retroactively. I do not want to misspeak to Bob—can you handle with him, please? . . . .

Stultz responded through an October 21, 2008 e-mail that he [would] talk to Bob Wimpee.

*Id.* at 10-12 (nomenclature modified).

Unsurprisingly, DFS's decision to walk away from the Contract; DFS's failure to seek restoration of the improperly transferred credits; and DFS's refusal to pay XTO for the gas that XTO delivered to the Meters that were, at all relevant times, assigned to DFS ultimately spawned the instant litigation. First, on March 9, 2010, XTO filed a complaint, followed eventually by a first amended complaint, and, finally, by a second amended complaint, which XTO filed on June 1, 2010. The second amended complaint named as defendants DFS, Equitrans, EQT Energy, and EQT Corporation. Therein, XTO asserted the following claims:

1.    Breach of Contract against DFS;

2.    Tortious Interference with Contractual Relations against EQT Energy;

3.    Breach of Contract against EQT Energy;

4.  Unjust Enrichment / *Quantum Meruit* / Goods Accepted against EQT Energy;

5.  Conversion against Equitrans; and

6.  Vicarious Liability of EQT Energy and EQT Corporation for Conversion by Equitrans.

***See*** Second Amended Complaint at 10-17.

On June 8, 2010, DFS filed its answer, which included new matter, counterclaims, and cross-claims. The counterclaims against XTO were for breach of contract and unjust enrichment. DFS also raised cross-claims against the EQT defendants (collectively, "EQT")[4] of conversion, tortious interference with contractual relations, unjust enrichment, and indemnification and/or contribution. On June 30, 2010, XTO responded to DFS' answer, adding a cross-claim in the alternative for indemnification and joint liability against EQT in the event that DFS prevailed on its counterclaims against XTO.

On July 1, 2010, EQT filed its answer, new matter, and cross-claim to XTO's second amended complaint. Therein, EQT asserted, *inter alia*, a cross-claim against DFS for indemnification.

_____

[4]  In its second amended complaint, XTO explained that it used "EQT" as a collective name for Equitrans, EQT, and EQT Corporation because "(1) that is the nomenclature that [DFS] ha[d] used in [a prior] pleading; and (2) after reasonable investigation such entities in many instances appear to be indistinguishable." Second Amended Complaint at 9 n.1. Notably, the EQT parties have filed only joint pleadings and briefs in this litigation. Thus, we adopt the same convention when it is not necessary or beneficial to refer to the parties individually.

On September 21, 2010, DFS filed an additional cross-claim against Linn. On September 23, 2010, the trial court entered a case management order directing that discovery be completed by February 24, 2011; expert reports be filed by March 24, 2011; and motions for summary judgment be filed by April 25, 2011. On October 11, 2010, EQT filed a complaint joining the Linn parties as defendants. Therein, EQT asserted a claim for breach of warranty of title. On November 9, 2011, Linn filed preliminary objections to EQT's complaint against Linn. On January 5, 2012, the trial court sustained Linn's preliminary objections to EQT's complaint with prejudice, leaving Linn subject only to DFS's cross-claims.

In the months that followed, discovery was completed and all parties filed motions for summary judgment. After hearing argument, on June 12, 2012, the trial court denied DFS's motion for summary judgment relative to the dueling contract claims between DFS and XTO and granted summary judgment to XTO on its contract claim. On July 9, 2012, the trial court entered an order granting Linn's motion for summary judgment relative to DFS's cross-claims against Linn as additional defendant. On December 28, 2012, the trial court entered an order granting EQT's motions for summary judgment against XTO and DFS, dismissing all of the latter parties' claims against EQT.

On February 1, 2013, XTO filed a motion for summary judgment against DFS on DFS's claims alleging that XTO had failed to mitigate its damages. On March 26, 2013, the trial court granted XTO's motion for

summary judgment. The trial court ordered a status conference for April 18, 2013, to address the status of the parties' various claims. At the April 18 conference, after determining that no claims remained to be resolved, the trial court entered final judgment on all claims, ripening this case for appeal. DFS (837 WDA 2013) filed a timely appeal on May 20, 2013, and XTO (885 WDA 2013) and EQT (890 WDA 2013), respectively, filed timely cross-appeals thereafter. On June 20, 2013, this Court granted the parties' "Consent Motion to Consolidate Related Appeals."[5]

DFS raises the following issues:

1. Whether DFS even breached its contract with XTO, given that the fact-finder could reasonably resolve ambiguous contract language by concluding that DFS was not obligated to pay XTO until gas was actually credited to DFS?

2. Whether XTO failed to mitigate damages resulting from breach of a contract for the purchase of natural gas, where XTO rejected a reasonable offer to purchase the gas and otherwise refused to sell the gas to a third party, instead choosing to watch the value of the gas decline over time?

3. Whether [EQT] wrongfully converted DFS's property and tortiously interfered with DFS's contracts, where they diverted gas away from DFS without permission, retained possession of the gas, withheld possession from DFS, and misled DFS into believing that the gas belonged to another buyer.

_____

[5] The trial court did not direct the parties to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). In lieu of a Rule 1925(a) opinion, for reference we have only the trial court's several orders and memoranda disposing of the claims at issue. We find those discussions sufficient to elucidate the trial court's reasoning. Thus, the absence of a discrete Rule 1925(a) opinion presents no impediment to our review.

Brief for DFS at 7 (issues reordered to reflect the order of discussion).

Excluding its counterstatement of DFS's issues, XTO presents the following issue:

> Whether [EQT] wrongfully tortiously interfered with XTO's contracts with DFS, where they removed DFS' credit from certain month[s'] gas, failed to give DFS credit for other month[s'] gas, knew about the DFS-XTO contract, purposefully engaged in conduct that prevented DFS from receiving credit for the natural gas, and knew there was a substantial certainty that XTO would be harmed by such conduct?

Brief for XTO at 6.

Excluding its counterstatements of DFS's and XTO's challenges to the trial court's entry of summary judgment in EQT's favor, EQT raises the following issue: "Whether the [t]rial [c]ourt erred in dismissing [EQT's] claim against [Linn]?"  Brief for EQT at 4.[6]

Inasmuch as each party challenges trial court rulings granting or denying motions for summary judgment, we begin by reviewing the governing legal standards:

> A reviewing court may disturb the order of the trial court [granting or denying summary judgment] only where it is established that the court committed an error of law or abused its discretion.  *Capek v. Devito*, 767 A.2d 1047, 1048, n.1 (Pa. 2001).  As with all questions of law, our review is plenary. *Phillips v. A-Best Prods. Co.*, 665 A.2d 1167, 1170 (Pa. 1995).

_____

[6]    While it has filed a brief opposing EQT's issue and addressing other arguments presented by DFS and XTO, Linn has not challenged any of the trial court's rulings.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof . . . establishes the entitlement of the moving party to judgment as a matter of law." *Young v. PennDOT*, 744 A.2d 1276, 1277 (Pa. 2000). Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Penna. State Univ. v. County of Centre*, 615 A.2d 303, 304 (Pa. 1992).

*Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citations modified).

[T]he issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo.* This means we need not defer to the determinations made by the lower tribunals. To the extent that [the appellate court] must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010) (citations omitted).

DFS first challenges the trial court's rulings with respect to XTO's contract claim. DFS presses only one theory in arguing that the trial court erred: DFS contends that the relevant contract provisions, viewed as a whole, were ambiguous. Consequently, DFS asserts, a jury, rather than the

trial court, should have resolved that ambiguity with the benefit of extrinsic evidence.

Our Supreme Court has set forth the principles governing contract interpretation as follows:

> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

*Ins. Adjustment Bureau, Inc., v. Allstate Ins. Co.*, 905 A.2d 462, 469 (Pa. 2006) (citations omitted).

DFS's entire argument is predicated upon the proposition that the contracts governing its gas purchase contract with XTO were ambiguous, a question of law that the trial court did not resolve in DFS's favor.[7] DFS briefly and aptly frames the dispute as follows:

---

[7]   XTO contends that DFS waived this argument because, before the trial court, XTO argued only that the contracts were **unambiguous**. Thus, XTO contends, DFS did not preserve the alternative argument that the contracts were ambiguous. *See* Brief for XTO at 28-31 (citing Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for

*(Footnote Continued Next Page)*

XTO's breach of contract claim can be distilled to a single issue: whether DFS was obligated to pay XTO for gas that Equitrans failed to credit to DFS's pool. XTO posits that DFS's payment obligation accrued when the gas was "delivered." DFS interprets the contracts differently, to require payment only after Equitrans credited the gas to DFS's pool.

Brief for DFS at 35 (citation omitted).

The determination as to whether a contract is ambiguous is a question of law to be resolved by the court. *Kripp v. Kripp*, 849 A.2d 1159, 1164 n.5 (Pa. 2004) (citing *Easton v. Washington County Ins. Co.*, 137 A.2d 332 (Pa. 1957)). "In making the ambiguity determination, a court must consider the words of the argument, alternative meanings suggested by

*(Footnote Continued)* ————————————————

the first time on appeal.")). In support of its argument, XTO directs this Court's attention to a slew of statements drawn from DFS's pleadings in which DFS asserted, in various terms, that the contracts were unambiguous. XTO also cites *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17 (Pa. Super. 1995), in support of the proposition that theories of relief with respect to contract interpretation that are not raised in the trial court may not be presented for the first time on appeal. DFS responds that *Rappaport* is distinguishable because, in that case, the distinction was not between two different theories of interpretation, but rather the presentation on appeal of an ambiguity argument when in the trial court the appealing party had raised only that a mistake rendered performance impracticable, a question not directly implicating contract interpretation. *See* Omnibus Reply Brief for DFS at 7-9. DFS further contends that its argument on appeal in fact is couched first in plain language, and only in the alternative in terms of ambiguity. This latter proposition is a stretch; we find only a single sentence in DFS's lead brief that supports its characterization, and only by implication, *see* Brief for DFS at 36 ("[A]t a minimum, the contract is ambiguous . . . ."); In substance, DFS's argument presses only ambiguity as a basis for relief. Nonetheless, we agree with DFS that, once it raised contract interpretation issues, it preserved all arguments relating to interpretation, because the trial court was obligated to take into account all governing principles of contract interpretation in resolving the question of law. Accordingly, we decline to find this issue waived.

counsel, and extrinsic evidence offered in support of those meanings. *Walton v. Phila. Nat'l Bank*, 545 A.2d 1383, 1388 (Pa. Super. 1988) (citations omitted). Our standard of review for questions of law is *de novo*, and our scope of review is plenary. *Kripp*, 849 A.2d at 1164 n.5.

We begin our analysis by reproducing the various sections of the contracts that the parties cite in support of their respective arguments:

ARTICLE II—QUANTITY

* * * *

2.2    If Seller's gas is to be delivered to Buyer at specified wells or meters, Seller dedicates to Buyer full production from Seller's wells or meters listed on the Confirmation, unless otherwise stated on the Confirmation.

* * * *

ARTICLE III—DELIVERY

3.1    The "Delivery Point(s)" for Seller's gas shall be the wells and meters specified on the Confirmation . . . .  Title to the gas shall pass to Buyer at the Delivery Point(s).

* * * *

3.3    As between the parties thereto, Seller shall be in control and possession of the gas and responsible for any injuries, claims, liabilities, or damages caused thereby until the gas shall have been delivered to the Delivery Point(s), and after such delivery as between Buyer and Seller, Buyer shall be deemed to be in possession and control thereof and responsible for any injuries, claims, liabilities, or damages caused thereby . . . .

* * * *

ARTICLE IV—PRICES

* * * *

4.2.1  . . . Buyer should make payment to Seller on or about the 25th day of the month following the production month . . . .

- 19 -

ARTICLE V—MEASUREMENT

> 5.1   Unless otherwise stated on the Confirmation, all gas delivered by Seller to Buyer shall be measured in Dekatherms at the Delivery Point(s).   Buyer shall pay for Seller's gas in the quantity credited to Buyer's account by the Pipeline.

The Contract at 1-2.

DFS contends that it is reasonable to interpret paragraph 5.1 of the Contract as preventing XTO from establishing DFS's putative obligation to pay for gas delivered from April through October 2008, because that production was never credited to DFS's pool.  Framed in the terms used in paragraph 5.1, DFS cannot "pay for Seller's gas in the quantity credited to Buyer's account by" Equitrans when Equitrans has not credited Buyer's account at all.[8]  DFS elaborates on its argument as follows:

> Importantly, the [Contract does] not state that DFS is obligated to pay for gas that flows through a meter if it **is not credited** to DFS's pool.   XTO argued that DFS was obligated to pay **regardless** of whether Equitrans credited DFS's pool for the gas.  DFS, on the other hand, interprets the [Contract] to condition DFS's payment obligation upon two events:   (1) gas flowing through the Meters **and** (2) Equitrans crediting this gas to DFS's

---

[8]   There is no dispute that, as of the inception of this litigation, Equitrans had not credited DFS's account.  However, Equitrans did, in 2011, tender the appropriate credits to DFS, which DFS refused to accept.  **See** Letter from Patrick Cavanaugh to Brian Wood, 1/24/2011 (offering to tender mis-assigned credits); Letter from Brian Root to Patrick Cavanaugh, 1/27/2011 (declining the credit on the bases that the volumes "do not belong to [DFS]" and due to the pending lawsuit").  Brian Root's letter declining the credit was erroneous in one particular:   DFS does not dispute that the Contract specified that title would pass to DFS upon XTO's delivery of the gas to the Meters, which XTO undisputedly did.

pool. The choice between these competing constructions cannot be made by the court, but rather is reserved for the fact-finder.

Brief for DFS at 38 (emphasis in original). DFS argues that any other interpretation would nullify paragraph 5.1.

XTO provides the following summary of its contrary position:

DFS'[s] position is a remarkably brazen one. The only contract in existence is between []XTO and DFS, under which XTO fully performed every month in question by timely delivering gas to DFS, and under which DFS paid XTO. But when [Equitrans] reversed DFS'[s] previous credit for XTO's gas, DFS did not ask [Equitrans] for a return of the credit. Instead, DFS quickly analyzed the economics of the event and determined that in light of falling gas prices it could make a quick $450,000 due to [Equitrans'] improper reversal of credit. Thus, within a matter of days of [Equitrans'] misdeed, DFS unilaterally decided that it was no longer under contract with XTO. DFS has not paid XTO since for the subject gas. Thus, DFS'[s] scheme was to use [Equitrans'] transgression as an excuse to profit at XTO's expense. DFS'[s] *modus operandi* was its refusal to ask for the credit to be returned. Those are the reasons DFS has been forced to contrive a construction of Section 5.1 that does not require [XTO] to be paid unless [Equitrans] first gives [DFS] credit for the gas.

Brief for XTO at 33.

XTO also maintains that DFS's argument effectively transforms a minor provision related to the measurement of the gas delivered (paragraph 5.1) into a condition precedent that effectively nullifies paragraph 3.1, confounding the established principle that a condition precedent will only be recognized as such when the parties' intent to treat it that way can be discerned from the contract language read as a whole. *Id.* at 35-37 (citing, *inter alia*, **Acme Markets, Inc., v. Fed'l Armored Express, Inc.**, 648 A.2d

- 21 -

1218, 1220 (Pa. Super. 1994) ("While the parties to a contract need not utilize *any* particular words to create a condition precedent, an act or event designated in a contract will not be construed as constituting one unless that clearly appears to have been the parties' intention." (emphasis in original)); *West Dev. Group, Ltd., v. Horizon Fin'l, F.A.*, 592 A.2d 72, 76 (Pa. Super. 1991) ("Generally, an event mentioned in a contract will not be construed as a condition precedent unless expressly made such a condition.")).

The trial court rejected DFS's argument for the following reasons:

[I]t is XTO's position that the scope of Article V is defined by its title: "Measurement." This is a two-sentence Article. The first sentence explains how gas shall be measured. The apparent purpose of the second sentence is to have [Equitrans'] measurements govern what DFS will pay and XTO will receive.

In this case, there is no dispute over the quantity of the gas that XTO delivered. The dispute is over who owns the gas that XTO delivered. This is not a matter that the parties would have intended for Equitrans to decide because this dispute has nothing to do with information known to Equitrans. Consequently, I find DFS's reliance on Section 5.1 to be misplaced.

However even assuming that [paragraph] 5.1 applies, DFS cannot simply decide to accept Equitrans' decision to take away DFS's credits for gas DFS believed to be its gas and for which XTO is entitled to be paid. Title had passed to DFS, and it would have been the expectation of both parties that delivery and transfer of title would result in Equitrans furnishing credit for the gas to DFS. DFS cannot both hold title and express no opposition to a decision of Equitrans to credit another entity for the gas to which it holds title.

In this case, it would have been easy for DFS to have the credits restored and the credits for future deliveries to be credited to DFS. Equitrans was confused as to whether DFS or EQT Energy

should receive credits for the gas delivered by XTO. Since EQT Energy was not claiming that it should be credited for the gas, there would not have been any opposition to a request made by DFS to Equitrans to give DFS the credits for the gas delivered by XTO. DFS, instead, chose not to approach Equitrans, apparently because of the financial benefits that it would receive from the decline in the price of gas if Equitrans did not reverse the transaction.

DFS contends that under [paragraph] 5.1, a Pipeline credit is a condition precedent to payment. However, Equitrans is obligated to give credit to DFS for gas in the gathering pool belonging to DFS. DFS cannot refuse to pay for the gas delivered by XTO if DFS never sought a credit that would have been given. In other words, the credit was DFS's for the asking. Since it never asked for the credit, it cannot rely on [paragraph] 5.1.

T.C.O., 6/12/2012, at 13-14 (footnote omitted; nomenclature modified). The trial court further observed that "[t]he Uniform Commercial Code provides that every contract imposes an obligation of good faith in its performance." *Id.* at 14 n.13 (citing 13 Pa.C.S. § 1304).

Aside from boilerplate citations in support of global principles of contract interpretation, DFS's entire argument consists of an appeal to common sense not unlike the trial court's, although their respective analyses lead to divergent outcomes. In this connection, DFS neither acknowledges nor attempts to explain or excuse its undisputedly conscious decision to abandon the Contract (and, consequently, not actively seek restoration of the misplaced credit) primarily or exclusively when it discovered that it would lose money if it adhered to the Contract. Furthermore, XTO had no contractual relationship with—and hence no authority to compel action by— Equitrans. Rather, DFS alone had such a relationship and the closely

correlated discretion to press the matter until Equitrans' accounting error was rectified. But DFS, seeing a benefit to be gained by sitting on its hands, declined to act. At that point, XTO undisputedly had fully performed its obligation under the Contract; DFS, in turn, relied upon a situation over which it had far more control than XTO to avoid rendering *quid* for XTO's *quo*.

Although we recognize some substance to DFS's contentions regarding the availability of two interpretations, we do not believe that DFS's interpretation of paragraph 5.1 of the Contract is **reasonable** as a matter of law. As XTO correctly notes, the law is loath to impute the parties' mutual intention to impose a condition precedent on performance in the absence of clear evidence of that intent. Viewing paragraph 5.1 in isolation or in tandem with the balance of the Contract, and in particular with paragraph 3.1, which confers title to the gas in question upon DFS upon XTO's performance, it would be a stretch to find such an intention in this case.

Indeed, all that gives DFS's interpretation the patina of reason are the unusual circumstances surrounding this case. Where the situation diverged from common experience was in Equitrans' failure not only to remove the credit from EQT Energy without documentation supporting the removal, as it did, but also its failure to return the credit to DFS immediately, as its own records indicated should have happened. Things only devolved when DFS declined to pursue those credits in pursuit of greater profit.

Needless to say, in any given case where something like this happens, if payment is required notwithstanding the pipeline's failure to account for the credits arising from a seller's delivery of gas to the meters, it may be difficult to reach an estimate of the payment obligation in question. However, four considerations militate against inferring from this observation that, under the circumstances of this case, a buyer is relieved of any payment obligation unless and until a party with whom the seller has no contractual relationship holds up its own end of a separate bargain between pipeline and buyer. First, there is no dispute that DFS initially was made aware of the credits that had been assigned at least for the months of April, May, and June of 2008: DFS timely paid XTO upon receiving Equitrans' accounting for XTO's deliveries in those months, deducting that payment from future transactions only when it discovered that Equitrans had removed and failed to restore those credits. Second, as noted by XTO, adjustments to prior months' accountings, sometimes substantial ones, are *de rigeur* in the industry and sometimes occur following a significant delay following the period to be adjusted. **See** Brief for EQT at 8 ("If there is an error in an invoice, it is common gas industry practice for the gathering system operator [*i.e.*, Equitrans] to issue a Prior Period Adjustment ("PPA") in the next monthly invoice."). Third, just as DFS affirmatively could have taken steps to ensure that Equitrans rectified its error, it also could have asked Equitrans to account for XTO's production for July through October of 2008, encompassing the remaining period at issue in this litigation. Finally, as the

trial court observed, DFS long has known the volume of XTO's production. *See* T.C.O., 6/12/2012, at 13 ("In this case, there is no dispute over the quantity of the gas that [XTO] delivered.").

While this case might have been extraordinary enough to preclude the parties' anticipation of such events in drafting the Contract, we conclude that it is not reasonable to imagine that XTO intended, under paragraph 5.1, that a buyer might delay its performance indefinitely as a consequence of a third-party error, let alone that it might do so while endeavoring consciously to profit from the mistake. With XTO's delivery to the Meters, its performance obligation was satisfied and title for the gas passed to DFS, legally triggering DFS's obligation to perform. At a minimum, it was reasonable for DFS to take such steps as were necessary to ensure that the delivered gas was accounted for in due course. The trial court did not err in so finding.[9] Consequently, we affirm the trial court's entry of summary judgment in favor of XTO on its contract claim.

We note as well the dangerous precedent we would set in endorsing DFS's conduct in this case. Were we to do so, no similarly structured gas purchase contract would be safe. To wit, because there is a one- to two-month lag between delivery and accounting, any time the price drops

---

[9] In another, similar situation, a fair and difficult dispute might arise as to what sort of payment would be due from a buyer to a seller when an accounting had not yet been provided. But, as set forth above, this is not such a case.

relative to the contractual purchase price during the lag between delivery and accounting, it would be in the buyer's interest to abandon the contract and seek an equal measure of gas elsewhere at a better price. This would be tremendously disruptive, were it to become commonplace.

In DFS's second issue, DFS contends that the trial court erred when it dismissed DFS's claims that XTO failed to mitigate damages. *See* Brief for DFS at 30-35. The trial court so ruled upon two bases: first, because DFS and XTO had equal opportunities to mitigate the damages in question and, second, because there could be no certainty that, if XTO sold the gas at issue in this case to another buyer, it would have obtained a better price than it would have received at some other time. T.C.O., 3/28/2013, at 3-5.

DFS contends that the trial court should have concluded that jury questions inhered in whether XTO had a superior opportunity to sell the gas, thereby mitigating damages, and that DFS "never had the ability to obtain and sell the gas to mitigate damages." Brief for DFS at 31. DFS's argument hinges upon the proposition that questions of fact remain regarding whether DFS relinquished its rights to the gas, whether the gas was credited to another potential buyer (*e.g.*, EQT Energy), and whether XTO had "specific and definite opportunities to sell the gas, including an offer from EQT Energy to purchase the gas at the November 2008 market price." *Id.* at 34. DFS further contends that the evidence would support a jury finding that "Equitrans, for its part, worked exclusively with XTO to facilitate a sale of the

gas, and permitted XTO to try to sell the gas while it sat on the Equitrans system." *Id.* (citations omitted).

XTO responds first that DFS is mistaken in asserting that XTO had the "superior" opportunity to sell the gas or that the mitigation question, focusing as it does upon the reasonableness of the efforts to mitigate made by the party with the burden of doing so, cannot be resolved as a matter of law.  Brief for XTO at 24 (citing, *inter alia*, **Loyal Christian Benefits Ass'n v. Bender**, 493 A.2d 760, 763-64 (Pa. Super. 1985) (affirming disposition of mitigation claim on summary judgment)).  XTO further emphasizes that XTO had no legal right to dispose of gas to which XTO undisputedly had no title once it was delivered it to the Meters.  *Id.* at 26-27.  XTO maintains that the trial court correctly found that DFS undisputedly had an obligation to seek restoration of the credits, that DFS failed to do so because it sought a financial advantage that lay in relinquishing those rights, and that DFS cannot seek relief from XTO for not selling gas that DFS could have taken control of merely by demanding that Equitrans credit DFS for the gas.  **See id.** at 24-28.

It is true that "a party who suffers a loss has a duty to make a reasonable attempt to mitigate damages."  **Ecksel v. Orleans Constr. Co.**, 519 A.2d 1021, 1028 (Pa. Super. 1987).  However, "[t]he injured party is not obligated to mitigate damages where both he and the liable party have an equal opportunity to reduce damages."  **Bender**, 493 A.2d at 763 (Pa. Super. 1985) (citing **S.J. Groves & Sons Co. v. Warner Co.**, 576 F.2d

524 (3d Cir. 1978)). While we are not bound by the **S.J. Groves** decision,[10]

we nonetheless believe that it ruled consistently with Pennsylvania law when

it made the following observation:

> Where both the plaintiff and the defendant have had equal opportunity to reduce the damages by the same act and it is equally reasonable to expect the defendant to minimize damages, the defendant is in no position to contend that the plaintiff failed to mitigate. Nor will the award be reduced on account of damages the defendant could have avoided as easily as the plaintiff. The duty to mitigate damages is not applicable where the party whose duty it is primarily to perform a contract has equal opportunity for performance and equal knowledge of the consequences of nonperformance.

576 F.2d at 530 (citations omitted); **accord TruServ Corp. v. Morgan's

Tool & Supply Co., Inc.**, 39 A.3d 253, 262 (Pa. 2012). Plainly, the latter

conditions were true of DFS in the instant case, and, in effect, the trial court

so concluded. **See** T.C.O., 3/28/2013, at 3-4.

It is important to note that "the burden is on the party who breaches

the contract to show how further loss could have been avoided through the

reasonable efforts of the injured party." **Ecksel**, 519 A.2d at 1028.

Moreover, contrary to DFS's position, this Court has blessed trial court

determinations as a matter of law that no duty to mitigate existed under

---

[10] **Cf. Martin v. Hale Prods., Inc.**, 699 A.2d 1283, 1287 (Pa. Super. 1997) ("Decisions of the federal courts lower than the United States Supreme Court possess a persuasive authority. Nevertheless, a federal court's interpretation of state law does *not bind* state courts." (citations omitted; emphasis in original)).

such circumstances, demonstrating that it is not *per se* necessary to submit a dispute about such opportunities to a jury. ***Id.***; ***Dox Planks of N.E. Penna. v. Ohio Farmers Ins. Co.***, 621 A.2d 132 (Pa. Super. 1993).

This Court's decision in ***Dox Planks*** is instructive. At issue in that case was the duty to mitigate of a supplier of pre-cast concrete barriers to the appellant contractor. The trial court determined as a matter of law, and this Court agreed, that because the barriers already had been received by the contractor and had been used on the underlying highway project at the time of the contractor's breach of its obligation to pay, the appellee supplier "was precluded from taking steps to avoid loss on the breach of the contract." 621 A.2d at 135-36.

While it is true that DFS opted not to act upon its right to the gas, it is equally true that it would have taken little effort for it to do so and that DFS, in fact, recognized that it had an **obligation** to do so. ***See, e.g.***, Deposition Testimony of Joseph Vanzant, 12/1/2010, at 151 ("If I had gone to [XTO] and [XTO] had said that was not correct, they had not sold [the gas] to anyone else, then [DFS] would have had an obligation to go back to Equitrans and contest their removal . . . of the volumes."). Indeed, at all relevant times it would have been easier for DFS to claim and sell the credits (at whatever price) to which it **already had title** than it would have been

for XTO to seek to reclaim title to those credits and resell them.[11]  Instead of already having taken advantage of the credits and refusing to pay, as the contractor had done with the concrete barriers in **Dox Planks** at the time of the breach, DFS figuratively left the concrete barriers (*i.e.*, the gas credits) in a side lot on its work site (*i.e.*, Equitrans' pool) but deliberately refused to install them, having found another supplier offering comparable items at a lower price.  Then the buyer (*i.e.*, DFS) insisted that the seller (*i.e.*, XTO) had the principal duty to resell the barriers of which the seller no longer had title or possession.

It makes little sense to submit the question to a jury when the breaching party fails to establish a *prima facie* case that the non-breaching party had an opportunity to mitigate, and that its opportunity was at least superior to that of the breaching party; the law does not require otherwise. We conclude that the trial court did not err as a matter of law or abuse its discretion when it determined that DFS had sufficient opportunity to mitigate the impending damages from DFS's own breach of contract and that XTO

_____

[11]    That this is the case is established constructively by Crider's deposition testimony acknowledging that she was mistaken initially in transferring credit to EQT Energy and thereafter mistaken in removing the credit from EQT Energy without restoring it to DFS.  She responded affirmatively during her deposition when asked whether she "should have given DFS credit" when she discovered her error.  Deposition of Leslie Crider, 11/16/2010, at 77-78.   She further testified that such transfers of credits are an appropriate subject of a prior period adjustment ("PPA").  **Id.** at 87.

had no obligation to mitigate those damages. Thus, we affirm the trial court's rejection of DFS's claim for mitigation.

In DFS's final issue, it argues that the trial court erred in granting summary judgment to EQT on DFS's cross-claims for conversion and tortious interference with DFS's contractual relationship with XTO. Brief for DFS at 41-63. We address these issues in turn.

A claim for conversion will lie when one party denies another party's "right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." **Shonberger v. Oswell**, 530 A.2d 112, 114 (Pa. Super. 1987) (citing **Stevenson v. Economy Bank of Ambridge**, 197 A.2d 721, 726 (Pa. 1964)). Specific intent need not be proved: "[A]n intent to exercise dominion or control over the goods which is in fact inconsistent with the [victim's] rights establishes the tort." **Id.** Moreover, money may be the subject of a claim for conversion. **Id.**; **cf. Pittsburgh Constr. Co. v. Griffith**, 834 A.2d 572, 581 (Pa. Super. 2003) ("Money may be the subject of conversion."). Nonetheless, "[n]ot every destruction or deprivation of property amounts to a conversion; there must be an actual appropriation of it by the offending party **for his own use**." **Chrysler Credit Corp. v. Smith**, 643 A.2d 1098, 1100 (Pa. Super. 1994) (quoting 37 P.L.E. Trespass § 81) (emphasis added).

This last point is germane inasmuch as we find little merit to EQT's argument that, given the nature of Equitrans' function, the actual molecules delivered to the Meters by XTO were never possessed by Equitrans, but

rather that the subject behavior reflected merely an accounting error. Be that as it may, we are not prepared to hold that such rights, which are not unlike cash in hand, cannot form the subject of a conversion claim. **But see Pittsburgh Constr. Co.**, 834 A.2d at 581 ("[T]he failure to pay a debt is not conversion."). We assume *arguendo* that they may, but we find DFS's argument unavailing for other reasons.[12]

Specifically, we find that DFS has failed to establish both a lack of consent and a lack of justification. Undisputedly, Equitrans' accounting error resulted only in a brief deprivation of DFS's rights to the subject gas, one which was rectified at the time that DFS learned of Equitrans' misfeasance. After it obtained such knowledge, however, DFS did not take the slightest step to rectify the error; rather, it deliberately considered how best to benefit from the mistake. Moreover, upon partial correction of the error (*i.e.*, by removing the credit from EQT Energy's pool without restoring it to DFS), Equitrans did not hold the gas to its own benefit or that of EQT Energy, but rather in a sort of limbo that persisted only because no entity claimed it.

In **Norriton East Realty Corp. v. Central Penn Nat'l Bank**, 254 A.2d 637 (Pa. 1969), our Supreme Court held that a similar variety of acquiescence constituted consent sufficient to preclude a claim for

---

[12] This Court may affirm a trial court ruling on any correct basis. **Rambo v. Greene**, 906 A.2d 1232, 1235 n.4 (Pa. Super. 2006).

conversion. In that case, the appellant-mortgagor, at appellee-mortgagee's request, assigned all leases for the subject property to the mortgagee and directed its rental agent to turn over all rents to the mortgagee. The mortgagee later initiated foreclosure proceedings and purchased the property at a sheriff's sale. After further proceedings, the mortgagor filed suit against the mortgagee (which by then had surrendered the property and appurtenances to a third party) for conversion arising from the mortgagee's alleged improper retention of various appliances that were not implicated in the foreclosure action. *Id.* at 638.

Our Supreme Court reversed the lower court's determination that the mortgagee had converted the subject items. The Court noted first that the intent requirement was not satisfied: Because the goods originally came into the possession of the mortgagee with the consent of the mortgagor, they were not transferred in violation of the mortgagor's possessory rights. Moreover, our Supreme Court found that "[p]ossession was not withheld **since no demand was made of [the mortgagee] at any time [that the mortgagee] could have acquiesced**." *Id.* at 639 (emphasis added). "A defendant who has come rightfully into possession in the first instance," the Court explained, "becomes a converter when he refuses to deliver on demand. Since there has been no wrongful taking or disposal of the property, demand and refusal are necessary to complete the tort." *Id.* (quoting Prosser, Torts § at 74 (2d ed. 1955)). Because the mortgagor made no demand until after the mortgagee had transferred the personalty in

- 34 -

question to a third party, and therefore had relinquished the ability to return the party to the mortgagor, "there was no unreasonable withholding." *Id.*

At no time relative to this appeal did DFS make any demand of Equitrans that it restore DFS's credits for the gas in question. To the contrary, DFS made a calculated decision not to pursue those rights, was notably tardy in informing its counterparties of that decision, and even refused the credits in question when tendered by Equitrans in 2011. With DFS, the only party with a proper claim to the gas, refusing to claim it, we must conclude that Equitrans did not act wrongfully in leaving it in limbo: It was neither Equitrans' nor EQT Energy's nor XTO's gas to sell. It would defy reason to hold Equitrans responsible for retaining credit that its rightful owner had disclaimed. DFS's conduct was inconsistent with a conversion claim when its calculated acquiescence to Equitrans' retention of the credits was practically indistinguishable from consent. Inasmuch as there are no genuine issues of material fact calling into question whether DFS willfully acquiesced to Equitrans' actions, the trial court did not err in granting summary judgment to EQT on DFS's conversion claim.

Turning to DFS's argument in support of its tortious interference claim against EQT, *see* Brief for DFS at 48-49, DFS correctly notes that, in Pennsylvania, such claims are governed by the Restatement (Second) of Torts § 766A, which provides as follows:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person, by preventing the other from performing the contract or

causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

***See also Al Hamilton Contr. Co. v. Cowder***, 644 A.2d 188, 191 (Pa. Super. 1994).

Without delving into the other elements of such a claim, we find that DFS's argument in support of this claim is afflicted with difficulties establishing pecuniary loss. Noting that the price of gas has fallen steadily since 2008, DFS argues that EQT's failure properly to credit the gas to DFS in a timely manner denied DFS the opportunity to sell the gas at more favorable 2008 prices. DFS notes that the gas was not ultimately credited until 2013, late in the instant litigation. ***See*** Brief for DFS at 59-60. However, DFS deliberately did not ask that its credits be restored in 2008. Rather than seek prompt action to correct what amounted to a bookkeeping error, DFS was content, even eager,[13] to make up its negative balance in the pool with the less expensive gas that was available at that time.

DFS maintains that what it deemed favorable at the time was, in fact, injurious:

Because Equitrans chose not to credit DFS's pool for the April through October 2008 gas production when it entered the

---

[13] In an e-mail from Joseph Vanzant to Wayne Hinter transmitted on September 2, 2008, *i.e.*, the very day that the crediting error first came to DFS's attention, Vanzant estimated that "this adjustment from Equitrans will net us somewhere near $450,000 in reduced gas costs. **Yay!**" (emphasis added).

Equitrans gathering system, Equitrans prevented DFS from reselling the gas at that time, when the market value of the gas was much more favorable, and instead has compelled DFS to sell the gas in a less favorable market, and at a substantial loss.

Brief for DFS at 60.[14]  However, DFS effectively gambled on XTO's willingness to acquiesce to DFS's abandonment of the Contract, a gamble that it lost.  That DFS's expectation that abandonment would redound to its benefit proved short-sighted does not establish that DFS suffered actionable damages.

Furthermore, DFS has failed to establish that EQT's actions prevented DFS from its performance under the Contract.  First, it cannot be said that EQT in any way interfered with XTO's performance, because XTO undisputedly fully satisfied its obligations under the Contract.  Second, for precisely the same reason that we reject DFS's interpretation of the Contract, we must conclude that DFS was obliged to perform notwithstanding Equitrans' mistakes.  While those mistakes may have complicated the process by which DFS could have performed, it cannot be said that EQT **prevented** DFS from doing so pursuant to the terms of the Contract.

_____

[14]  The trial court noted that DFS did not raise "a claim for losses sustained, because of falling gas prices, between the date that the credits were removed and the date they would have been restored if [DFS] had taken reasonable steps to have the credits restored."  T.C.O., 12/28/2012, at 2 n.2.

Finally, and perhaps most importantly, the record establishes that DFS's failure to perform was exclusively of its own choosing, reflecting precisely the sort of bad faith that the Uniform Commercial Code proscribes. *See* 13 Pa.C.S. § 1304 ("Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement."); *cf. Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 617 (3d Cir. 1995) ("[C]ourts generally utilize the good faith duty as an interpretive tool to determine the parties' justifiable expectations . . . ."). Absent DFS's demand for the credit and Equitrans' refusal—the consideration fatal to DFS's conversion claim—it cannot be said that there remain any questions of material fact as to whether EQT intentionally or improperly interfered with DFS's performance under the Contract. DFS plainly chose not to perform, and its actions and inaction—as the damages it suffered, if any—reflected that choice. That DFS miscalculated cannot fairly expose EQT to liability for tortious interference associated with an unfortunate circumstance that lay within DFS's means to rectify. Consequently, the trial court did not err in granting EQT's motion for summary judgment as against DFS's claims for intentional interference with DFS's contract with XTO.

The above discussion concludes our review of the issues raised by DFS on appeal. We next consider XTO's lone issue raised in its cross-appeal, to wit, that the trial court erred in granting EQT summary judgment as against XTO's claim for tortious interference with contractual relations.

XTO's argument on this issue also fails for want of a specification of the discrete damages caused by EQT. With regard to this necessary element of a tortious interference claim, XTO identifies only two categories of damages: The approximately $1.5 million that it contends that it was owed for April through June 2008 production (*i.e.*, the amount that DFS originally paid before deducting it when Equitrans reallocated the credit to EQT Energy) and the approximately $1.8 million that it asserts it was owed for its July through October 2008 production. Brief for XTO at 50-51. The trial court's entry of summary judgment in XTO's favor as against DFS, which we have affirmed, entered damages in precisely these amounts, as well as awarding substantial pre-judgment interest. ***See*** Final Judgment, 4/18/2013, at 1 (awarding a judgment of $4,265,353.77 for XTO and against DFS, exclusive of costs of suit). Consequently, XTO has failed to identify any damages arising from EQT's conduct for which it has not already been compensated. Thus, we affirm the trial court's order granting summary judgment to EQT relative to XTO's claim for tortious interference.

Finally, we address EQT's cross-claims against Linn. These claims were pressed by EQT only contingently, in the event that XTO's claims against EQT were restored by this Court on appeal. ***See*** Brief for EQT at 53. Because we have affirmed the trial court's order exonerating EQT of all liability in this case, EQT's cross-claims against Linn are moot. Consequently, no relief is due.

For the foregoing reasons, we affirm in its entirety the trial court's entry of judgment in this matter, albeit in some instances for different reasons than those offered by the trial court.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/22/2014